In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4205

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

QUAWNTAY ADAMS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 04 CR 30029-3—**David R. Herndon**, *Chief Judge*.

ARGUED NOVEMBER 30, 2009—DECIDED OCTOBER 25, 2010

Before KANNE, ROVNER, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. Quawntay "Bosco" Adams was arrested in a reverse sting operation shortly after he accepted the keys to a van into which government agents had loaded some 1400 pounds of marijuana. A jury later convicted Adams on charges that he possessed more than 100 kilograms of marijuana with the intent to distribute, *see* 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii), conspired to commit money laundering, *see* 18 U.S.C. § 1956(a)(1)(A)(I) and (h), and attempted to escape from custody, *see* 18

U.S.C. § 751(a). Adams appeals, contending that he was deprived of his right to a speedy trial; that the evidence does not support his conviction for conspiracy to commit money laundering; and that, because government agents had disabled the van loaded with marijuana before they turned it over to an unwitting Adams, he did not have true control over the marijuana and therefore did not possess it. We agree that the evidence does not support the conviction for conspiracy to commit money laundering but otherwise affirm the judgment of conviction.

## I.

Adams trafficked in wholesale quantities of marijuana and, to a much lesser degree, in other narcotics. The evidence established that Adams engaged in a series of relatively large-scale marijuana transactions in the Fall of 2003 and continuing until his arrest in the reverse sting operation in January 2004. Although Adams lived in Southern California, his market for the distribution of marijuana was metropolitan St. Louis, Missouri. Adams had others transport the marijuana to St. Louis on his behalf, while he traveled there separately to unload and distribute the marijuana when it arrived. His activities in connection with these shipments frequently took him across the river from St. Louis into the Southern District of Illinois, where this case was indicted and tried. For example, one of Adams' Illinois customers, Steve Carraway, would later testify that he purchased a total of more than 245 pounds of marijuana from Adams on five occasions between August and December 2003 in Illinois.

Jorge Gomez was one of Adams' sources of marijuana. Gomez first supplied marijuana to Adams in the late summer of 2003. Pedro Barrios-Casteneda ("Barrios") was one of Gomez's sources of marijuana. Barrios was part of a group of individuals who imported marijuana from Mexico to the United States by way of McAllen, Texas.

As we have noted, when Adams shipped marijuana from California to St. Louis, he typically used couriers to transport the marijuana in his stead. The trial testimony revealed that he favored white females with low self-esteem as couriers, because he believed they were less likely to be stopped by the authorities and were easier to manipulate. Nicole Bowline was one such courier. Bowline met Adams in an Internet chat room in September 2003 and subsequently took up residence with him. She agreed to be a courier because she needed the money. Bowline transported three different shipments of marijuana to the St. Louis area for Adams in September and October 2003. Adams promised her $2,000 for each of the trips. Bowline made the first trip by bus, with the marijuana and some Ecstasy pills secured to her body using Saran Wrap and hidden under business clothes that were several sizes too large.[1] Adams and several of his cohorts met Bowline at the bus station in St. Louis, removed the drugs from her person at a house in the city, and then spent the night at a motel

---

[1] Bowline would later testify that she narrowly escaped detection when the bus was stopped en route and its luggage compartment inspected by a drug-detecting dog. Had the dog been brought onto the bus, it surely would have alerted to Bowline, who testified that she reeked of marijuana.

across the river in Collinsville, Illinois. Bowline then flew back to Los Angeles. Bowline made the second and third trips to St. Louis by rental car. In those instances, between 15 and 20 bricks of marijuana were hidden in the doors and rear seat cushions of the vehicle. Adams (and accomplices) met her in Rolla, Missouri on the second trip and in St. Louis on the third. On both occasions, Adams and Bowline stayed for a couple of days at the same motel in Collins-ville, Illinois while Adams disposed of the marijuana. Johnny Johnson, who rented the cars that Bowline used on her second and third trips to St. Louis, testified that he rented cars on Adams' behalf on a total of five occasions.

Judging from Bowline's experience, Adams did not treat his couriers particularly well. For one thing, he was stingy with money: although he had promised to pay Bowline $2,000 for each trip she made, he never paid her anything close to that; and during her third rip to St. Louis, she had to call Adams and ask him to wire her another $100 after the first $100 he had given her to pay for gasoline and other expenses had been depleted. Later, after arriving in St. Louis, Bowline decided she had had enough and tele-phoned her aunt saying that she wanted to come home. On overhearing the call, Adams shoved her against a wall and threatened to kill her if she did not keep quiet.

Adams converted much of the cash that he realized on the sale of marijuana into postal money orders. He had accomplices acquire those postal orders at multiple post offices and always in amounts less than $3,000, in order to avoid unwanted scrutiny. On Bowline's second trip to St. Louis, for example, Adams directed her to buy some

$10,000 worth of money orders at three or four different post offices in St. Louis using cash that he gave her. She purchased them in amounts no greater than $2,500, "[b]ecause [otherwise] they would ask to see my ID." R. 460 at 188. When she gave the money orders to Adams, he tucked them inside of his sock and shoe for safekeeping. Bowline purchased more money orders on her third trip to St. Louis, again at several different post offices. She also wired $2,000 to Johnny Johnson on Adams' behalf.

Adams used the postal orders for a variety of purposes, some related to his drug trafficking—for example, Gomez testified that Adams gave him $10,000 or more in money orders in payment for some marijuana that he previously had fronted to Adams, and Johnson was likewise paid in money orders for cocaine that he had given Adams to sell in St. Louis on his behalf—and some not—for example, the purchase of a restored Fleetwood Cadillac automobile and the rent on his apartment. Occasionally, Adams had the money orders redeemed for cash: Bowline testified that in September 2003, Adams had her cash money orders totaling $8,400 that she had purchased a week earlier in St. Louis and made payable to herself; she redeemed them at a number of different California post offices, "because you can't cash too many at one location." R. 460 at 177.

Adams had sufficient success in the St. Louis marijuana market that he sought to step up his operations. Sometime in or around the Fall of 2003, after Adams remarked to Gomez that they could "make a lot of money" together in St. Louis (Adams thought they could double their revenue), R. 462 at 251, Gomez arranged a meeting with

Adams, Barrios (Gomez's supplier), and Juan Valencia, Barrios' partner. When Adams told the group that he wanted to deal in larger quantities of marijuana, Barrios asked him whether he could handle as much as 1000 pounds of marijuana, and Adams said that he could. Barrios agreed to the proposal, Gomez recalled, on the condition that Adams find "a stash house where we could keep the weed and another house where we could keep the money," R. 462 at 252 (so that in the event of a robbery Adams and Gomez would not lose both their supply and their cash), as well as a location in St. Louis where a semi tractor-trailer hauling the marijuana could be unloaded.

While Adams was making these arrangements, Barrios received a 300-pound shipment of marijuana in Atlanta from his supplier (his uncle) in Mexico. Barrios arranged for Adams to take delivery of that shipment in December 2003. This was a trial run, Gomez later testified, to confirm that Adams had the ability to sell the 1000-pound quantity of marijuana that he sought. "See, . . . they test you to make sure you can get rid of the weed," he explained. R. 462 at 255. "They're not going to send you a big amount right away." *Id.* Adams and Gomez drove to Atlanta and met Barrios there. Adams gave Barrios an initial payment of $24,000 for the marijuana (a down payment of roughly 25 percent) and then had two young white women drive the marijuana in tandem with Adams and Gomez (who were in Adams' car) from Atlanta to St. Louis. There, the marijuana was unloaded from the women's car and secured in an apartment that Adams had rented to use as one of his stash houses. Adams proceeded to sell the marijuana in quantities of 20 or 30 pounds.

When Adams subsequently sold all but 60 pounds of the Atlanta shipment within a period of roughly 10 days, Barrios proceeded to make arrangements for a 1000-pound shipment of marijuana. Adams was to pay Barrios more than half a million dollars for the shipment (the agreed upon price, according to Gomez, was $550 per pound). Barrios commissioned Angel Bustos-Aguirre ("Bustos") to find a truck driver who would transport the marijuana in a semi tractor-trailer from McAllen, Texas to St. Louis. Bustos in turn contacted Juan Bortfeld, whom he believed to be the owner of a trucking company; Bortfeld was actually an undercover criminal investigator for U.S. Immigration and Customs Enforcement ("ICE"). Bortfeld agreed to haul the marijuana for a fee of approximately $80,000, which was to be paid from the balance that Adams still owed Barrios on the Atlanta shipment. When the marijuana was ready for shipping in January, Bortfeld told Bustos that he was unavailable and that another driver, Scott Crawford (also an ICE agent), would drive the load to St. Louis. One hundred twenty-two bricks (about 1400 pounds) of marijuana were loaded onto Crawford's semi at a ranch near McAllen. Crawford drove the shipment to an ICE office in San Antonio, Texas, where it was off-loaded, weighed, and then flown to a small Illinois airport outside of St. Louis. Crawford in the meantime drove the empty truck to St. Louis, where he was joined by his fellow agent, Bortfeld. Adams, Barrios, and their respective entourages also had assembled in St. Louis to consummate the delivery of the marijuana.

Bortfeld and Crawford (sans the marijuana) met up with Bustos, Adams, and Barrios on January 22, 2004, at a St.

Louis-area gas station and then followed them to a kind of junkyard in East St. Louis, Illinois that Adams had chosen for purposes of unloading the marijuana. The agents at first agreed to deliver the marijuana to that location but later vetoed it for tactical reasons; they told the conspirators that they did not think they could get the semi tractor-trailer into the junkyard.

On the following afternoon, Bortfeld and Crawford met with Bustos and told him that they had transferred the marijuana from the semi to a van, which they would hand over to him at a truck stop. That evening, after ICE agents had loaded the marijuana into a van and driven it to the Gateway Truck Stop in East St. Louis, Bortfeld telephoned Bustos to advise him that the marijuana was ready for delivery and gave him directions. Adams, Barrios, and Bustos drove to the truck stop. When they arrived, Bustos gave Bortfeld a backpack containing some $46,000, which was less than the $70,000 to $80,000 that Bortfeld and Crawford were expecting. Adams said that he could produce the balance in half an hour, and the agents agreed. Crawford surrendered the keys to the van. Adams took the keys, entered the van, and attempted to start the vehicle's ignition. He had no success, however, because ICE agents had disconnected the van's battery. Police moved in to arrest Adams, Barrios, and Bustos. Several of the other co-conspirators, who were waiting elsewhere, fled when they received word of the arrest.

In a third superseding indictment, the grand jury charged Adams with conspiring to distribute marijuana, possessing in excess of 100 kilograms of marijuana with the

intent to distribute, conspiring to launder the proceeds of his marijuana sales with the intent to promote further marijuana trafficking, attempting to escape from custody, and escaping from custody. Barrios, Bustos, Bowline, and Johnson were also indicted, but each of them pleaded guilty; only Adams went to trial. Adams pleaded guilty to the escape charge at the outset of the trial but maintained his innocence on the other charges. After hearing the evidence, the jury acquitted Adams of conspiring to distribute marijuana but convicted him of the other charges. The district court ordered Adams to serve a term of 420 months in prison.

## II.

### A.  Speedy Trial Act Claim

A criminal complaint was filed against Adams on January 26, 2004, and Adams made his initial appearance before a magistrate judge on January 27, 2004. The original indictment, which charged Adams, Bustos, and Barrios with conspiring to distribute marijuana and possessing marijuana with the intent to distribute, was returned and made public on February 18, 2004. Additional defendants and charges, and the eventual guilty pleas of all defendants but Adams, led ultimately to the third superseding indictment on which Adams was tried. That indictment was filed on July 20, 2006. The following month, Adams moved to dismiss the two marijuana-trafficking charges, on the ground that he had not been tried on those charges within 70 days as prescribed by the Speedy Trial Act, 18 U.S.C. § 3161(c)(1). Adams reasoned that the speedy trial clock on

those charges commenced with the filing of the original indictment on February 18, 2004. He later expanded his motion to include the dismissal of the remaining charges, which were added by the first superseding indictment filed on November 18, 2004. The district court denied his motion, concluding, as relevant here, that the June 3, 2005 arraignment of Johnson, the last defendant to be brought into the case (by way of the second superseding indictment filed on May 17, 2005), reset the speedy trial clock as to all defendants, and that subsequent continuances of the trial date, including in particular two continuances requested by Adams' own counsel (and objected to by Adams in retrospect) tolled the running of the clock, such that the 70 days had not yet run on any of the charges.[2]

In reviewing the district court's Speedy Trial Act ruling, we examine its legal conclusions de novo and its factual findings for clear error. *E.g.*, *United States v. Loera*, 565 F.3d 406, 411 (7th Cir.), *cert. denied*, 130 S. Ct. 654 (2009). As we discuss below, among the periods of delay that the Act excludes from the computation of the time within which the defendant's trial must commence is a delay occasioned by the court's decision to grant a continuance of the trial date consistent with the ends of justice. § 3161(h)(7)(A). Absent legal error, our review of the excludability of such continuances is deferential. *United States v. Broadnax*,

---

[2] Additional time periods were excluded based on a pretrial motion filed by Adams on June 21, 2005, and a motion to continue the trial date filed by co-defendant Johnny Johnson on July 7, 2005. Adams has not challenged the excludability of these time periods.

536 F.3d 695, 698 (7th Cir. 2008); *United States v. Neville*, 82 F.3d 750, 762 (7th Cir. 1996); *see also United States v. Hills*, Nos. 09-2151, 09-2152, & 09-2153, 2010 WL 3239394, at *2 (7th Cir. Aug. 18, 2010). The chronology of events below, including the continuances that were granted at the request of Adams' own counsel, persuade us that he was not denied his statutory right to a speedy trial.

As the district court properly recognized, when an indictment charges more than one defendant, the speedy trial clock for all defendants typically does not begin to run until the last of the defendants appears. *E.g.*, *United States v. Harris*, 567 F.3d 846, 849 (7th Cir.), *cert. denied*, 130 S. Ct. 1032 (2009); *see* § 3161(h)(6). This principle holds true when an additional defendant is added to the case by way of a superseding indictment, as Johnson was. *See Henderson v. United States*, 476 U.S. 321, 323 n.2, 106 S. Ct. 1871, 1873 n.2 (1986). Adams disputes this point, contending that to reset the clock each time a new defendant is indicted would give the government the ability to delay trial as long as it can keep scrounging up new defendants. However, his argument runs head-long into the Supreme Court's decision in *Henderson* as well as our own decisions holding that a new 70-day speedy trial period commences with the appearance of a later-added defendant. *Id.* at 323 n.2, 106 S. Ct. at 1873 n.2; *Harris*, 567 F.3d at 849-50; *United States v. Owokoniran*, 840 F.2d 373, 375 (7th Cir. 1987); *see also United States v. Parker*, 505 F.3d 323, 327 (5th Cir. 2007); *United States v. King*, 483 F.3d 969, 973-74 (9th Cir. 2007); *United States v. Barnes*, 251 F.3d 251, 258-59 (1st Cir. 2001); *United States v. Piteo*, 726 F.2d 50, 52-53 (2d Cir. 1983). And Adams does not contend that Johnson or any other defen-

dant not named in the original indictment was improperly joined or was named on a pretext to delay the trial. He does argue, summarily, that the delay of more than a year in naming Johnson as an additional defendant was unreasonable and as such was not excludable under the plain terms of the statute, which authorizes the exclusion of only a "reasonable period of delay" when the defendant is joined for trial with a co-defendant as to whom the time for trial has not yet run. § 3161(h)(6). But Adams offers no analysis of why the delay in indicting Johnson (who was not one of the individuals arrested at the Gateway Truck Stop) should be deemed unreasonable on the facts of the case, which involved a conspiracy having a relatively wide geographical scope and many actors. By failing to develop his argument in any meaningful way, he has waived it. *E.g.*, *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). Johnson was not indicted until May 17, 2005, and with his arraignment on June 3, 2005, the speedy trial clock began to run anew as to Adams and his co-defendants. Adams has never contended that the speedy trial clock had already run out by that time; so we need only consider whether more than 70 days passed without proper exclusion by the district court *after* the clock was reset on June 3, 2005.[3]

---

[3] We note that Adams did seek a severance from his co-defendants on May 18, 2005, the day after Johnson was indicted. However, that motion was properly denied by the district court, and, indeed, Adams does not contend otherwise. This case therefore does not present an exception to the general rule that periods of delay attributable to one defendant apply to his

(continued...)

The district concluded that all but 21 days of the period following Johnson's arraignment were properly excludable from the running of the speedy trial clock. A series of continuances of the trial date, granted at the request of one defendant or another—including Adams—comprised the bulk of the time that the court deemed excluded. The Act provides for the exclusion from the speedy trial calculation of "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A) (formerly § 3161(h)(8)(A)). The statute goes on to set forth a number of factors that the judge must consider in determining whether a continuance is warranted. § 3161(h)(7)(B). It also requires the judge to put on the record his reasons for finding that the ends of justice outweigh the best interest of the public and the defendant in a speedy trial. § 3161(h)(7)(A). As the Supreme Court has recognized, "[t]he strategy of § [3161(h)(7)] . . . is to counteract substantive openendedness with procedural strictness." *Zedner v. United States*, 547 U.S. 489, 509, 126 S. Ct. 1976, 1990 (2006). "This provision demands on-the-record findings and specifies in some detail certain factors that a judge must consider in making these findings." *Id.*, 126 S. Ct. at 1990.

---

[3] (...continued)
codefendants as well. *E.g.*, *Harris*, 567 F.3d at 849-50.

Adams challenges the excludability of two of the continuances that the district court granted after Johnson's arraignment.[4] The challenged orders include the court's order of October 19, 2005, granting Adams' request for a continuance and resetting the trial date to January 30, 2006,

---

[4] There are other continuances that the court granted in that time period, *see supra* n.2, but these are the sole orders that Adams challenges as insufficient to justify the exclusion of time from the speedy trial calculation.

We note that the Supreme Court's decision in *Bloate v. United States*, 130 S. Ct. 1345 (2010), renders non-excludable a 10-day period allowed for the government and Johnny Johnson to file additional pretrial motions on June 3, 2005 (the date of Johnson's arraignment), as no such motions were filed at the conclusion of that period. But that period of time was also covered by a prior order continuing the trial date until June 13, 2005, at the request of defendant Bowline, who was negotiating an agreement with the government that ultimately resulted in her guilty plea and testimony as a witness on the government's behalf. Adams did not object to Bowline's request for the continuance at the time, and the district court in granting her request expressly found that the ends of justice served by granting the continuance outweighed the best interest of the public and the defendants in a speedy trial. R. 141. Only later, when he sought dismissal of the charges on speedy trial grounds, did Adams contend that the continuance was not excludable under the Speedy Trial Act. However, we discern no error in the court's decision to grant the unopposed continuance, including its ends-of-justice finding. The period of time covered by this continuance thus tolled the speedy trial clock as to Adams as well as Bowline. *E.g.*, *Harris*, 567 F.3d at 849.

and the court's order of March 8, 2006, granting another request by Adams to continue the trial date, and rescheduling the trial for June 26, 2006. These continuances were granted at the request of his own counsel, which casts doubt on the validity of his subsequent contention that he was deprived of his statutory right to a speedy trial. *See, e.g., United States v. Larson*, 417 F.3d 741, 746 (7th Cir. 2005) (defendant who requests continuance should not be entitled to turn around later and claim that continuance violated his speedy trial rights). Adams attempts to resolve that doubt by contending that he himself never consented to the continuances and, to the contrary, wished his trial to proceed without delay. But as we recently observed in *Hills*, " 'there is no requirement that counsel obtain [the defendant's] consent prior to making purely tactical decisions such as the decision to seek a continuance,' " and the Act itself provides for the exclusion of continuances granted at the request of the defendant *or* his counsel. 2010 WL 3239394, at *5 (quoting *United States v. Gearhart*, 576 F.3d 459, 463 n.3 (7th Cir. 2009)); § 3161(h)(7)(A). In any event, for the reasons discussed below, we find that the district court had proper grounds on which to continue the trial date.

When he sought the first of these continuances, Adams' counsel contended that the case was complex, that it involved multiple witnesses and voluminous documents, and that there was a good chance that more individuals would decide to cooperate and become witnesses for the government. "Denial of a continuance in this matter would lead to a miscarriage of justice for [Adams], as it is unreasonable to expect adequate preparation for trial proceed-

ings given the current trial setting." R. 180 at 1. Although the minute entry granting this motion did not memorialize the court's underlying rationale, the court subsequently entered a separate order setting forth its reasoning for both the October 19, 2005 continuance and another continuance granted on January 17, 2006 (the propriety of which Adams does not contest). In that later order, the court expressly found that the ends of justice outweighed the interests of the public and the defendant in a speedy trial, and by way of explanation noted that Adams' counsel had informed the court that he needed additional time to evaluate the weight that additional cooperating witnesses might add to the government's case and to adjust the defense strategy accordingly. R. 200. Subsequently, in addressing Adams' speedy trial motion, the court remarked that it was Bowline's sudden decision to cooperate that put Adams' counsel "into a tailspin" and caused him to seek additional time. R. 286 at 4.

The second request for a continuance, granted on March 8, 2006, was based on the fact that Adams' counsel had another trial scheduled to begin before the date on which Adams' trial (then set for March 27, 2006) was expected to conclude. The motion averred that Adams' counsel had another client facing trial in the Eastern District of Missouri on April 3, 2006; and given the age of that case and the number of parties involved, the judge presiding over that case had voiced his disinclination to postpone the trial any further. Counsel had expected his Missouri client to plead guilty, but that had not occurred. Counsel anticipated that Adams' trial would last longer than one week, so there was a possibility that if it began as scheduled on March 27, it

would not yet be over when the other trial was scheduled to begin. In its order granting this continuance, the court noted the conflict between the two trials and set forth an express finding that "the ends of justice served by granting of such [a] continuance outweigh the best interests of the public and Defendant in a speedy trial." R. 207 at 1-2.

The content of Adams' motions, coupled with the court's orders granting those motions and, with respect to the October 19 order, the court's subsequent elaboration of its rationale, reveal the relevant grounds for the continuances and are sufficient to comply with section 3161(h)(7). *See United States v. Napadow*, 596 F.3d 398, 405-06 (7th Cir. 2010). In both instances the court expressly found, in light of the circumstances that Adams' counsel cited, that the ends of justice served by granting the requested continuance outweighed the public's interest and the defendants' interest in a speedy trial. The fact that in one instance the court made that finding (and stated the reasons for it) in retrospect rather than contemporaneously with its order granting the continuance is immaterial; the Supreme Court has indicated that this is permissible, *Zedner*, 547 U.S. at 506-07, 126 S. Ct. at 1989, and the district court did put its rationale on the record well before Adams sought dismissal of the indictment on speedy trial grounds, which we have said is the prudent course, *e.g.*, *United States v. Rollins*, 544 F.3d 820, 830 (7th Cir. 2008); *see also Hills*, 2010 WL 3239394, at *6. Nor is the lack of express mention of the factors set forth in section 3161(h)(87)(B) fatal to the excludability of the continuances; the statute requires that the court consider those factors in weighing the competing interests and to put on the record its reasons for finding the continu-

ance warranted, but it does not require that the court recite the statutory factors or make findings as to each of them on the record. *See*, *e.g.*, *Napadow*, 596 F.3d at 405-06.

Adams takes the position that these continuances were unnecessary and that the grounds cited by his counsel in seeking them and by the district court in granting the continuances were insufficient to overcome his own interest, and that of the public, in a speedy trial. But the district court was in a much better position than we are to assess the merits of his counsel's representations and to determine whether the ends of justice warranted a delay in the trial date. Nothing that Adams has argued in hindsight convinces us that the district court clearly erred in its understanding of any fact or abused its discretion in balancing Adams' right to a speedy trial against the circumstances which, in the court's view, counseled in favor of a delay. Nor has Adams shown that he was prejudiced by the continuances in any concrete way. *See*, *e.g.*, *Hills*, 2010 WL 3239394, at *2 (citing *Broadnax*, 536 F.3d at 698).

## B. Conspiracy to Launder Proceeds of Marijuana Trafficking

Count Three of the indictment charged Adams with conspiring to purchase, mail, and cash postal money orders and to transfer money via Western Union with the intent to promote the further distribution of marijuana, knowing that the money involved represented the proceeds of marijuana trafficking. 18 U.S.C. § 1956(a)(1)(A)(I) and § 1956(h). This charge required the government to prove

that the defendant was "in fact part of the conspiracy to launder money, and . . . '(1) conducted a financial transaction with the proceeds of an illegal activity; (2) knew the property represented illegal proceeds; and (3) conducted the transaction with the intent to promote the carrying on of the [specified] unlawful activity.'" *United States v. Lee*, 558 F.3d 638, 641 (7th Cir. 2009) (quoting *United States v. Malone*, 484 F.3d 916, 920 (7th Cir. 2007)). After an independent review of the record, we agree that the evidence was indeed insufficient to support the jury's verdict on this count.

Bowline's purchase of postal money orders during her second and third trips to St. Louis in some respects constituted the best evidence of money laundering. We may infer—given Bowline's role as a courier, the fact that the money orders were purchased with cash that came into Adams' possession after Bowline carried marijuana to St. Louis, and that Bowline purchased the money orders on Adams' behalf and at his behest—that these transactions involved the proceeds of Adams' marijuana sales and that Bowline would have surmised as much. Furthermore, the fact that Adams directed her to purchase these orders in amounts no greater than $2,500 and not to buy them all at a single post office evidenced an effort to structure the transactions so as to avoid attracting the attention of the authorities and to conceal the source of the funds used to purchase the money orders. But Adams was not charged under the concealment prong of the statute, section 1956(a)(1)(B), but rather the promotion prong, section 1956(a)(1)(A), which, as we have noted, requires proof of an intent to promote the carrying on of the unlawful

activity from which the funds involved were derived—in this case, marijuana trafficking. But as the parties agree, the record contains no evidence that Bowline appreciated that the purpose of the money order purchases was to promote continued marijuana trafficking, such that the jury could infer that she and Adams were conspiring to launder money with that aim. Bowline testified that Adams did not tell her why he was purchasing money orders and that she had no idea of what the money orders were used for. R. 461 at 56-57. Proof along those lines is indispensable to a conspiracy conviction under the promotion prong of the statute. *See, e.g., United States v. Trejo*, 610 F.3d 308, 317-18 (5th Cir. 2010).

The same flaw in the evidence, plus a second, exists with respect to the money orders that Bowline cashed in California following her first trip to St. Louis. There is no evidence that the cash Bowline obtained in exchange for the money orders was used to promote further marijuana trafficking and that Bowline understood as much. At the same time, there is no evidence that these money orders represented the proceeds of marijuana trafficking, as opposed to the sale of Ecstasy (recall that Bowline carried Ecstasy as well as marijuana to St. Louis on her first trip) or stolen electronics, in which Adams also dabbled.

There are similar problems with respect to two different transfers of funds by wire that occurred during Bowline's third trip to St. Louis. Recall that while Bowline was driving from California to St. Louis, she ran out of money and had Adams wire her $100. Perhaps it is safe to assume that Bowline used the wired funds in furtherance of

marijuana trafficking (by buying gasoline for the car, for example). But there was no evidence as to the source of those funds, so no reasonable juror could conclude that they were the proceeds of marijuana trafficking. During the same trip, while Bowline and Adams were in St. Louis, Adams directed her to wire $2,000 to Johnson. However, Johnson testified that this represented payment for the cocaine he had given Adams to sell in St. Louis; so this transaction did not involve the proceeds of marijuana trafficking.

There were financial transactions involving other individuals, but these fare no better as proof of a money laundering conspiracy. On one occasion, Adams used money orders to pay Gomez for marijuana that Gomez had fronted to Adams previously. Gomez accepted this form of payment (in contrast to Barrios, who told Gomez, "I ain't a bank" (R. 462 at 241) when Gomez tried to pay Barrios with the same money orders), but there is no evidence that would support the inference that, in doing so, he was conspiring with Adams to launder the proceeds of his marijuana trafficking. Johnson also accepted money orders from Adams, but in payment for cocaine rather than marijuana. Finally, the evidence revealed that Adams used money orders to pay the rent on his California apartment and to buy a restored Cadillac. But nothing in the record would support the inference that Adams engaged in these transactions with the intent to promote further marijuana sales.

Adams has reviewed a number of additional transactions, but these transactions involved cash rather than money orders or wire transfers and as such were not the

types of transactions referred to in the indictment or the jury instructions. Consequently, we need not address them.

Our review of the trial record confirms that the evidence would not permit a reasonable finder of fact to find each of the elements of the money laundering conspiracy charge proven beyond a reasonable doubt. Adams is therefore entitled to a judgment of acquittal on Count Three.

C.  Possession of the Marijuana in the Van that Agents Had Disabled

The charge in Count Two, that Adams possessed 100 kilograms or more of marijuana with the intent to distribute on January 23, 2004, was premised on the notion that when Adams accepted the keys to the van into which the ICE agents had loaded the 1400 pounds of marijuana from Barrios and entered that van, he took possession of the marijuana therein. But because the battery had been disconnected and the vehicle was consequently inoperable, and he had no other means of leaving the truck stop with multiple officers waiting to arrest him, Adams contends that he could not have actually or constructively possessed the marijuana in the sense of having the ability to control it. At best he may have *attempted* to possess the marijuana, Adams reasons, but he was not charged with an attempt. In resolving Adams' challenge to the sufficiency of the evidence underlying his conviction on Count Two, we are obliged to view the evidence in the light most favorable to the government and will reverse his conviction only if no rational juror could find beyond a reasonable doubt that he possessed the marijuana with the intent to distribute.

*See, e.g.*, *United States v. Mitten*, 592 F.3d 767, 776 (7th Cir. 2010), *petition for cert. filed* (U.S. Apr. 9, 2010) (No. 09-10205).

Possession is defined as the "[t]he fact of having or holding property in one's power; the exercise of dominion over property." BLACK'S LAW DICTIONARY 1183 (7th ed. 1999). Possession may be actual or constructive. *E.g.*, *United States v. Kelly*, 519 F.3d 355, 361 (7th Cir. 2008). One actually possesses a thing when it is in his physical custody and control; he constructively possesses it when, although it is not within his physical possession, "he knowingly has the power and intention at a given time to exercise dominion and control over the object." *Id.* The power to exert control over an object is a prerequisite to a finding of either form of possession: "Implicit in a common-sense understanding of possession—both actual and constructive—is the notion that a defendant has some right or ability to control the disposition of an object." *United States v. Kitchen*, 57 F.3d 516, 524 n.2 (7th Cir. 1995); *see also United States v. Hunte*, 196 F.3d 687, 693 (7th Cir. 1999). The government asserts that Adams at least constructively possessed the marijuana once he accepted the keys to the van, and his possession became actual once he entered the van and put the key in the ignition, signaling his intent to drive away with the marijuana. In Adams' view this was all a fiction, given that he had no practical ability to leave the scene with the marijuana.

As Adams recognizes, this court and a number of our sister circuits have deemed the evidence sufficient to establish a defendant's actual or constructive possession of

narcotics once the defendant or his accomplice has taken custody of the drugs or manifested an intent to do so, notwithstanding the presence of law enforcement officers standing ready to arrest him. *See United States v. Perry*, 747 F.2d 1165, 1171-72 (7th Cir. 1984) (constructive) (defendant parked station wagon next to plane and opened rear of car to receive nearby suitcases that he knew contained cocaine); *see also*, *e.g.*, *United States v. Zavala Maldonado*, 23 F.3d 4, 7-8 (1st Cir. 1994) (constructive) (informant left cocaine in defendant's hotel room when defendant and informant went out to get a soda while they awaited arrival of purchaser, who was defendant's accomplice) (2-1 decision); *United States v. Posner*, 868 F.2d 720, 724 (5th Cir. 1989) (constructive) (defendant's co-conspirator accepted keys to defendant's rented van, which agent had loaded with marijuana, entered van, and attempted to start ignition, whereupon he was arrested); *United States v. Toro*, 840 F.2d 1221, 1237-38 (5th Cir. 1988) (actual) (defendant accepted cocaine from undercover agent and put it into a briefcase, which he then locked); *United States v. Damsky*, 740 F.2d 134, 139 (2d Cir. 1984) (constructive) (after defendant paid for hashish, undercover agent left key to camper, into which agent had loaded the hashish, on top of television in defendant's motel room); *United States v. Martorano*, 709 F.2d 863, 869-871 (3d Cir. 1983) (constructive) (after receiving payment, informant gave defendant keys to van which agents had loaded with P2P, and defendant in turn gave van keys to his accomplice, who unlocked and entered van and sat for a moment before he was arrested) (2-1 decision); *United States v. Jones*, 676 F.2d 327, 332 (8th Cir. 1982) (constructive and actual) (defendant ac-

cepted keys to agents' car, which was loaded with mari-
juana, and then off-loaded marijuana into his own van).
These decisions often emphasize that notwithstanding the
presence of undercover law enforcement personnel who
frustrated the defendant's plans to depart with and
distribute the drugs, the defendant, by knowingly taking
the drugs into his custody, has done all that he can do,
short of leaving the scene with them, to signal his desire
and intention to accept control over the drugs for purposes
of distributing them. *E.g.*, *Zavala Maldonado*, 23 F.3d at 8
("That the police are present and ready to frustrate distri-
bution does not make possession of drugs any less of a
crime, and a minute of possession is as much an offense as
a year of possession . . . . The completion of the crime does
not require that the defendant have a sporting chance.");
*Martorano*, 709 F.2d at 871 ("To require that the police allow
the criminals to escape with the drugs would place an
impossible burden on the police and on the courts seeking
to enforce criminal statutes as well as contribute to the very
evil that the statute is intended to eliminate.").

Our own more recent decision in *Kitchen* acknowledged
and distinguished this line of authority on the ground that
Kitchen, who before his arrest had done nothing more than
pick up a kilogram of cocaine for two or three seconds
before putting it back down and expressing dissatisfaction
with its purity to the agents who were offering it for sale,
had not unequivocally signaled his assent to the purchase.
57 F.3d at 521-24. The dispositive point in our analysis was
not the presence of agents who would have prevented
Kitchen from leaving with the cocaine, *id.* at 524, but rather

the transitory and inconclusive character of Kitchen's act of holding it, *id.* at 522-23. That fleeting moment when Kitchen had the cocaine in his hands in order to look it over was insufficient to manifest Kitchen's intent to complete the transaction and take the cocaine with him.

> By taking delivery of the drug and loading it into a briefcase or a van, a defendant clearly demonstrates his assent to the drug transaction. Here, however, we have no indication of assent. The record is devoid of evidence that Kitchen intended to walk away with the narcotics or otherwise transport them. This factual distinction might not be dispositive if the record revealed *any* evidence that Kitchen had completed the sale or indicated some sort of unequivocal agreement to complete the drug transaction. Given that sort of clear evidence, perhaps a momentary holding, without more, would be sufficient to demonstrate actual possession. But that is not the case before us now.

*Id.* at 522 (emphasis in original); *see also id.* at 523 ("Kitchen's momentary holding was in the context of inspection, not delivery."). Our analysis focused ultimately on the concept of control. A defendant's ability to exercise control over the narcotic, we said, is a prerequisite to his conviction for actual (and for that matter, constructive) possession of that contraband. *Id.*

> . . . In most cases of actual possession, because the defendant physically holds or carries the narcotics, his control over them is presumed. But to state that control is presumed is not to suggest that actual possession can be established when it is completely absent.

> The facts suggest that it was absent in this case. The constructive possession cases teach that a defendant must have ultimate control over the drugs. This requirement translates into the right, or the recognized authority within the "criminal milieu," to possess the drugs in question. . . .
>
> These factors are dispositive in the present case. Although Kitchen held the cocaine in his hand, he did not yet have a recognized authority to exert control over it. This is so not because the presence of federal agents would have ultimately prevented his success, but because he had not yet assented in any form to the transaction. Had he paid part of the purchase price, verbally assented to the deal, or otherwise unambiguously indicated his agreement to complete the deal, the case would be different. But the government has failed to point to factors that would enable a jury to find that Kitchen accepted the cocaine. It is critical here that, prior to giving some sort of assent to the sale, Kitchen's conduct was consistent only with that of a prospective buyer inspecting goods. He did not yet have the ability to control the contraband, despite the fact that he momentarily held it in his hand.

*Id.* at 524 (citations omitted); *see also id.* at 525 ("We believe that although Kitchen held the drugs for a moment, he neither controlled them nor had recognized authority over them. His conduct was consistent with inspection—but nothing more. Lack of control is dispositive under both the doctrines of actual and constructive possession.").

Here, by contrast, Adams unequivocally manifested his assent to possession of the marijuana by taking the keys to the van, entering the van, and attempting to start it. This was the culmination of a transaction that Adams himself had initiated with Gomez, Barrios and other co-conspirators. Bustos had hired Crawford and Bortfeld to transport the marijuana to St. Louis and deliver it to Adams. Adams, in turn, had taken every step expected of him, including his promise to make good on the balance owed to Crawford and Bortfeld, to complete the delivery sequence and to accept the marijuana into his own possession for the purpose of distributing it. The evidence leaves no doubt that had Crawford and Bortfeld been who he believed them to be rather than the undercover federal agents they were, Adams would have driven away from the truck stop with the marijuana. The fact that the van's battery had been disconnected does not meaningfully distinguish the facts of this case from those we found sufficient to show (constructive) possession in *Perry* or those which other circuits have found sufficient to establish possession. The presence of federal agents in those cases rendered the defendant's ability to leave the scene with the drugs just as improbable as it was here. Although in this case the van was inoperable, it was nonetheless in Adams' custody, and from the moment he took the van's keys into his hands he had the ability to exercise control over the van and its contents in many senses if not in the sense that he could have driven the van away. He could have locked the doors and at least temporarily kept others from entering the van; if he was armed he could have held the agents at bay; if he had rolling paper

he could have fashioned himself a joint; if he had a lighter he could have set the van on fire. It was not necessary for the agents to have left the battery connected in order to establish Adams' control over the van's contents. In the eyes of his coconspirators, Adams had a right to take possession of the marijuana once Crawford and Bortfeld had been paid; and when Adams accepted the keys to the van, entered it, and attempted to engage the ignition, he amply signaled his willingness and intent to exercise that right. Allowing him a chance to drive away was not necessary to establish his possession of the marijuana.

The facts, viewed favorably to the government, were therefore sufficient for the jury to find that Adams possessed the marijuana that agents had loaded into the van with the intent to distribute that marijuana. Adams constructively possessed the marijuana once he accepted the keys to the van, and he actually possessed it once he entered the van and attempted to start it.

### III.

Adams was not deprived of his statutory right to a speedy trial. The evidence was not sufficient to support his conviction on Count Three of the third superseding indictment for conspiracy to engage in money laundering. However, it was sufficient to support his conviction on Count Two for possession of 100 or more kilograms of marijuana with the intent to distribute. The case is remanded with directions to enter a judgment of acquittal on

Count Three of the third superseding indictment and for resentencing in light of that acquittal.

AFFIRMED IN PART, REVERSED IN PART,
and REMANDED