**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Cyril B. FITZHARRIS, Archie Edwin
Whatley and Arturo Cantu,
Defendants–Appellants.**

No. 79–5355.

United States Court of Appeals,
Fifth Circuit.

Dec. 22, 1980.

---

Bennie E. Ray, Brownsville, Tex., for Cantu.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff–appellee.

Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.

HENDERSON, Circuit Judge:

Arturo Cantu, Cyril Fitzharris and Archie Whatley appeal their convictions of conspiring to possess marijuana with intent to distribute, in violation of 21 U.S.C.A. § 846.[1] All three appellants contend that the trial court erroneously admitted confiscated marijuana. Cantu and Whatley insist that the evidence was insufficient to prove their involvement in the conspiracy. Partly because of the factual nature of these issues, and partly because of uncertainty at oral argument concerning the circumstances of the discovery of the marijuana, it is necessary to begin with a rather detailed statement of the evidence.

As early as 1975 the Drug Enforcement Administration (DEA) believed that Carlos Moreno led an organization running large quantities of illicit drugs north from Los Fresnos, Texas. On January 29, 1978, Crispin Trevino of the Harlingen, Texas police department learned that Moreno would soon ship a load of marijuana. Affidavit in support of search warrant ¶¶ 2 and 5. Accordingly, on the evening of January 30, 1978, he and DEA Special Agent Tony Tamayo set up surveillance at a Los Fresnos location frequented by Moreno's associates. There they observed three vehicles they knew were used by members of the Moreno organization: a white and yellow pickup truck, a blue Corvette, and a 1956 black Chevrolet convertible. Tr. 65–66. The

Roland E. Dahlin, II, Federal Public Defender, Karen K. Brown, Asst. Pub. Defender, Houston, Tex., for Fitzharris.

Hugh Loew, Austin, Tex., Edward A. Mallett, Houston, Tex., for Whatley.

---

1. 21 U.S.C.A. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment. . . ."

21 U.S.C.A. § 841(a)(1), the target offense, states: "[I]t shall be unlawful for any person knowingly or intentionally to . . . possess with intent to manufacture, distribute, or dispense, a controlled substance."

truck left the scene, followed by the agents who lost sight of it. When they returned the other two cars were gone.

The next day, January 31, 1978, Agent Bustamante, who was working with the other agents, radioed Trevino that he was following Carlos Moreno's Cadillac north. Trevino and Tamayo caught up with Bustamante in Robstown, Texas, where they witnessed a rendezvous between the occupants of the Cadillac and those of a yellow Vega[2] registered to defendant Cantu. Tr. 68–71. Cantu was there. Tr. 74. The Cadillac proceeded to Austin where its occupants visited Room 229 of the Colonial Inn motel. Tr. 76.

Knowing it was often used by the Morenos, DEA Agent Heather Campbell had begun surveillance of the Colonial Inn on the night of January 30–31, 1978, and at about 1:30 a. m. the blue Corvette arrived. The next morning Campbell returned to the motel and saw the Corvette and the white and yellow pickup truck. She then went into the motel coffee shop and saw Jesus Moreno, Carlos' brother. Tr. 403–05.

Around 11:00 a. m. Campbell observed the Chevrolet parked alongside the pickup truck and the Corvette. The Chevrolet automobile left at about 1:00 p. m., with Campbell trailing behind. While pursuing the Chevrolet she learned it had been in Harlingen the night before. Tr. 406–07. She followed the Chevrolet to the residence of Fitzharris, a ranch on Brant Road outside Austin. Tr. 407.

Agents Tamayo and Campbell were assigned to watch traffic approaching the Fitzharris ranch. Campbell was stationed near the freeway entrance to Brant Road; Tamayo was positioned down Brant Road, beyond the entrance to the ranch. When a car entered Brant Road, Campbell would radio the description to Tamayo. If the car did not pass Tamayo shortly after passing Campbell, they would know it had turned into one of the several driveways off Brant Road; perhaps the drive into Fitzharris' property. Tr. 148–52, 409–11, 464.

On the morning of February 1, 1978, Gary Doty, at the direction of Carlos Moreno, drove his blue and white 1972 Torino to the Colonial Inn. Tr. 77, 377. At the door of Room 229 he asked for Chico, again as per instructions. Doty was invited into the room, which was occupied by four men, among them Cantu. Chico (who was in fact Jesus Moreno) told Doty to put his car keys on a table. After a conversation in Spanish, to which Doty was not privy, one of the men picked up the keys, and he and Cantu left the room. Tr. 256–57, 378–80, 389. One of the two remaining men accompanied Doty down to the coffee shop to wait for the marijuana, Tr. 79, 381, leaving Chico alone.

Shortly thereafter, back at the ranch, Agent Campbell radioed Tamayo that Doty's car had entered Brant Road.[3] The Torino never reached Tamayo, but, after a few minutes, returned past Agent Campbell. Tr. 152–54. Agent Campbell was too far from Brant Road to see how many people were in the car. Tr. 441–42, 465–66.

When the agents set up surveillance, the gate to the Fitzharris ranch was closed. Tr. 152. After he realized the Torino had turned off Brant Road, Agent Tamayo drove toward Agent Campbell and saw that the gate was open, and that there were fresh tire tracks in the drive. He made a U–turn when he reached the highway, and on his way back to his original position he saw that someone had closed the gate. Tr. 154.

The Torino arrived at the Colonial Inn a few minutes later, Tr. 80–81, 155, without Cantu, Tr. 81, 382. Doty and his companion

---

2. Trevino testified the Vega was a station wagon, although Cantu's car was a two–door model. Gov't Ex. 18.

3. The appellants contend that the car observed on Brant Road may not have been Doty's, but Agent Campbell testified unequivocally to the contrary. Tr. 467. It appears that no one saw the Torino leave the motel, Tr. 17, 79–80, 125, 540, and Agent Campbell did not know that it was coming her way. Tr. 441, 475. It is true, as Fitzharris' attorney notes, that Agent Tamayo could not identify the Torino, Tr. 211, but he never saw it on Brant Road.

then returned to Room 229. After making partial payment for fifty pounds of marijuana and talking with Carlos Moreno over the phone, Doty went down to his automobile. Tr. 81, 382–84. Doty cracked the trunk of his car and saw several green plastic garbage bags. Tr. 250–54, 384. He then drove a few blocks and stopped the car to make sure the bags contained marijuana. Tr. 384, 394–401. While Doty was looking in the trunk the agent who was following him drove by and thought he saw marijuana.[4] Tr. 193, 213, 291, 317–18. Doty returned to his car, but was arrested before he could leave. Tr. 292, 385. The police seized about forty–nine pounds of marijuana from his trunk. Shortly thereafter the police at the Colonial Inn arrested the occupants of Room 229. Tr. 411–12.

About an hour later Agents Campbell and Tamayo were reinforced by the arrival of local police and the other agents. Tr. 156–57, 412. They entered the outer gate of the ranch and surrounded the fenced curtilage, which included a small, primitive house and connecting shed. Tr. 159, 235, 334. As the agents approached, Fitzharris came out the front door, and was told to lie down. Tr. 161, 183, 208, 235, 335. Cantu was discovered by an officer in one of the buildings. Tr. 163, 186, 208–09, 235, 312. No further search was made at that time, Tr. 163, 186, 235–37, 293, but a substantial amount of marijuana was in plain view.[5] Tr. 337. Fitzharris and Cantu were taken into town and Agent Campbell went to procure a search warrant. Several agents waited on the property, near Brant Road. Tr. 294–95.

Later in the afternoon Whatley drove up to the ranch. Tr. 295, 319, 327. He had a sack of groceries and a chainsaw inside his truck. Tr. 214, 295, 320. The officers on the scene greeted Whatley with drawn guns, and eventually arrested him. Tr. 295, 331. The arresting officer testified that Whatley told him "I don't understand you. I just come to feed my cattle."[6] Whatley explained that he had forgotten to leave the groceries when he stopped by his home. Tr. 296.

Later that night Agent Campbell returned with a search warrant. The agents seized the several hundred pounds of marijuana they had observed previously. Tr. 300. On a table the agents found a small electronic calculator and a piece of kraft paper with a list of notations composed of letters and numbers. Two notations contained the letters "ARCH." Gov't Ex. 42. Outside the house an agent searched a fifty–gallon can filled with trash, where he found bills and correspondence addressed to female members of Whatley's family, charge card receipts signed by Mrs. Whatley, and two receipts for car repairs. One receipt was made out to "Mrs. M. Whatley," and the other to "M. Whatley." Both were dated October, 1977, and contained Fitzharris' phone number. Tr. 233, 301–07; Gov't Ex. 28–35.

All of the appellants challenge the introduction of the marijuana seized from the ranch. The district court held a suppression hearing and, pursuant to stipulation, considered the evidence developed at the earlier probable cause hearing. The court held

---

4. At the trial there was some dispute as to whether Agent Irwin actually saw marijuana. The appellants do not and cannot show the relevance of this dispute here. Doty served as a government witness.

5. It is not clear whether the agents saw marijuana or simply thought the sacks they saw contained marijuana. At the magistrate's preliminary hearing Agent Campbell testified that an Agent Wolsch saw marijuana at the time of the arrest. Government exhibit 2 at 15. The parties stipulated to the use of this evidence at the suppression hearing. Tr. 2. Agent Campbell did not enter the ranch house until after she secured a search warrant. Tr. 476. *See*

F.R.Crim.P. 4(b) (finding of probable cause may be based upon hearsay evidence).

Outside the presence of the jury, Agent Irwin testified that he had not seen any marijuana in the heated part of the house. Tr. 236. On cross–examination, before the jury, he said, referring to the unheated shed, "[a]s you came through right here, this door was open and you could see green garbage bags and brown paper bags also that had the marijuana in them . . . ." Tr. 337.

6. At the pre–trial hearing on the motion to suppress Whatley said he told the agents he had come to the ranch to cut firewood. Tr. 6.

that since the defendants were not charged with a possessory crime, Whatley had no standing to challenge the ranch seizure, citing *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). R. 50. As to Fitzharris', it found that the warrant to search the ranch was supported by probable cause.

Both in their briefs and during oral argument the appellants forcefully maintained that the marijuana found at the ranch was the product of an illegal search, and was therefore inadmissible.[7] Specifically, they claimed that the marijuana was found during the warrantless search of the ranch. At oral argument the government's only response was to deny that the entering agents ever saw any marijuana. Our examination of the evidence reveals that at least some of the agents discovered what they perceived to be marijuana when they first entered the ranch. *See* note 5, *supra.*

In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court held that the Fourth Amendment requires suppression of evidence discovered and seized in the course of a warrantless entry into a suspect's home to make a routine felony arrest. Possibly exigent circumstances, such as danger to the officers or the likelihood that the evidence would otherwise be destroyed, will permit such an entry (the Court reserved this question). 445 U.S. at 581, 100 S.Ct. at 1377, 63 L.Ed.2d at 648. *Cf. Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d

441, 453 (1963). *See also United States v. Williams*, 622 F.2d 830, 841 (5th Cir. 1980) (en banc) (dicta on limited good faith exception to exclusionary rule). However, the district court never considered the matter of exigent circumstances.[8] Accordingly, for the purposes of this appeal we must treat the entry into the ranch as illegal.[9]

*United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), clarified prior rulings with respect to the exclusion of evidence on Fourth Amendment grounds. The Court abandoned the "automatic standing" rule in crimes of possession, previously adopted in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Instead, the inquiry is now whether a given defendant "was the victim of an invasion of privacy.", —— U.S. ——, 100 S.Ct. 2550 *quoting Jones.* Acting before *Salvucci*, the district court did not address this question–it simply concluded that since no possessory crime was involved Whatley had no standing to contest the seizures at the ranch. The government does not dispute that Fitzharris had a privacy interest in the ranch, and since our consideration of his case leads us to the conclusion that the evidence seized at the ranch was admissible against him, it would, in any case, also be admissible against Whatley.

■ "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong*

---

7. In no event would the appellants' identity be suppressible. *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (concurring opinions). *See* Note, *The Precedential Value of Supreme Court Plurality Decisions*, 80 Col.L.Rev. 756 (1980).

8. The appellants' motions to suppress alleged that the affidavit in support of the search warrant was inadequate, not that the marijuana had been discovered prior to the issuance of the warrant. Thus, the suppression hearing did not focus on this issue. On the other hand, at the trial, counsel for at least one of the appellants made clear that his objections extended to evidence discovered at the time of the arrest. Tr. 168. It may be that this objection came too late, and was therefore waived. *See* F.R. Crim.P. 12(b)(3). However, waiver is always a

difficult question, and as noted above, the government never argued waiver, but simply denied that the objection had any factual basis. Since we determine that the evidence was in any case admissible, we pretermit a decision on this point.

9. In *Payton* the Court was faced with two cases where the police entered residences looking for particular suspects. Here, the police entered what they suspected was a place of crime, not knowing whom, if anyone, they would find. We have no occasion to consider the significance of this distinction. *Cf.*, 445 U.S. at 620, 100 S.Ct. at 1397, 63 L.Ed.2d at 672 (White, J., dissenting) (Warrantless entry should be allowed when the police have "probable cause to believe that the person to be arrested committed a felony and is present in the house.").

*Sun*, 371 U.S. at 485, 83 S.Ct. at 416, 9 L.Ed.2d at 454. *See also Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). However, "this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from independent source they may be proved like any others. . . ." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920); *see Owens v. Twomey*, 508 F.2d 858, 865 (7th Cir. 1974).

■ Here, as pointed out in more detail later, the ranch was eventually searched pursuant to a search warrant. The affidavit in support of that warrant did not state that the affiant had previously seen marijuana at the house. However the affidavit could not have made such mention, because, with certain exceptions not here relevant, the government cannot use illegally obtained evidence. *Silverthorne.* So long as the warrant was valid and secured without reference to the events uncovered during the warrantless arrests, and so long as the police would have discovered the marijuana in any event, the fact that they saw it during a presumably illegal search did not require its suppression.[10] *But see United States v. Allard*, 634 F.2d 1182 (9th Cir. 1980); *United States v. Griffin*, 502 F.2d 959 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974).

Having concluded that the initial entry onto the ranch did not taint the subsequent seizure of the marijuana, we move on to whether the search warrant was supported by probable cause independent of the initial discovery of marijuana at the ranch.

■ Agent Campbell submitted a twelve paragraph affidavit in her request for the warrant. Paragraph two of the affidavit noted a two–and–a–half–year–old tip from a cooperating, anonymous person, which explained in some detail the way the Moreno gang moved marijuana and other drugs. Paragraph six was a summary of the results of the January 30, 1978, surveillance in Harlingen. Paragraph seven asserted, *inter alia*, that the 1956 Chevrolet was seen at the Austin TraveLodge Motel while members of the Moreno gang were there, and that agents followed it to the Fitzharris ranch. Paragraph 10 alleged that on the morning of February 1, 1978, "a white over baby blue late model Ford" entered the area of the Fitzharris ranch; that a few minutes later "a white over baby blue 1972 Ford Torino" arrived at the Colonial Inn; and that the Torino automobile was subsequently seized and found to contain about 50 pounds of marijuana. Paragraph eleven stated that for most of 1977 daily phone calls were made between the Fitzharris ranch and the Morenos.

The appellants focus on the dated tip (paragraph 2), insisting that it was so stale that it could not support a warrant. The district court recognized its obligation to carefully scrutinize anonymous tips, especially where the affidavit does not affirmatively state that the tipster has proven to be a reliable source. *See generally Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The court held that the tip was amply corroborated by "an independent investigation undertaken by state and federal drug officials." R. 50. The court specifically took notice of the regular phone calls from the ranch to the Morenos and the surveillance of Doty's car.

While the appellants dwell on the age of the tip, they virtually ignore paragraph ten, which dealt with the arrest of Doty. Paragraph ten linked the marijuana in Doty's car to the Moreno organization, and the car to the Fitzharris ranch.[11] It is true that the affidavit did not say that the car went into

---

**10.** Although Agent Campbell testified during the preliminary hearing on the motion to suppress that she did not know that there was marijuana in the house prior to the search, the appellants ignore the circumstances when they suggest the police would not have searched the house had they not seen the marijuana during the arrest.

**11.** The appellants insist that two cars were mentioned in paragraph ten, claiming that in 1978 a 1972 Torino could not be considered as "a late model" Ford. We disagree.

the ranch, but only into the area of the ranch. However, this information, together with the affiant's allegation that a car used by members of the Moreno organization had visited the ranch the night before, would justify a reasonable person in the belief that a crime had probably occurred there. If further evidence of a connection between Fitzharris and the Moreno organization (and thus this marijuana) were required, it was found in paragraph eleven's recitation of the record of phone calls between the ranch and the Morenos.[12]

■■ Whatley and Cantu also urge that the evidence was insufficient to show their participation in the conspiracy. The verdict can be upheld only if the jury could have found beyond a reasonable doubt that the defendants participated in the conspiracy. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When the facts in evidence support them, it is for the jury to make or reject inferences. Thus, on appeal of a conviction the evidence is to be reviewed in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *U. S. v. Butler*, 611 F.2d 1066, 1072 (5th Cir.), *app. pending* (1980), *stay denied*, —— U.S. ——, 100 S.Ct. 2960, 64 L.Ed.2d 837 (1980). *See generally*, Nesson, *Reasonable Doubt and Permissible Inferences: The Value of Complexity*, 92 Harv.L.Rev. 1187 (1972). But a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law.

■ As for Cantu, there was ample evidence to show "that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did some act or thing to further carry on that conspiracy." *United States v. Duckett*, 550 F.2d 1027,

1030 (5th Cir. 1977), *quoting Causey v. United States*, 352 F.2d 203, 207 (5th Cir. 1965). The record reveals that Cantu met with the Morenos in Robstown and from there continued on to Austin. He was at the Colonial Inn when Doty arrived, and heard Doty ask for marijuana. He left the motel in Doty's car, which returned with marijuana but without Cantu. Finally, he was arrested at the Fitzharris ranch, which the jury was free to conclude was the source of the marijuana. *See United States v. Alvarez*, 625 F.2d 1196 (5th Cir. 1980) (en banc).

■ The evidence against Whatley was not so substantial. He arrived at the Fitzharris ranch several hours after its occupants had been arrested. The government makes much of his arrival with groceries, and his statement that he was there to feed his cows, even though the agents did not see any livestock. Other evidence included numerous documents found in the trash barrel, tying the Whatley family to the ranch. The government also introduced the cryptic list found at the ranch, which contained the notation "ARCH." The government does not now contend that this list was admissible to show that truth of its contents (arguably that marijuana was delivered to Whatley), but only to show that the defendants knew Whatley. Finally, a witness from the telephone company testified to calls made between the Whatley and Fitzharris numbers, and calls from the Morenos to Whatley.[13] We conclude that this evidence necessarily leaves a reasonable doubt as to Whatley's guilt. His counsel moved for a judgment of acquittal at the close of the government's case and renewed the motion at the conclusion of the trial. This motion should have been granted.

---

12. That these phone calls support a finding of probable cause does not mean they would be sufficient to prove guilt beyond a reasonable doubt.

13. There are substantial questions about the admissibility of much of this evidence. For example, Whatley claims that the requirements of *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc) were not met before the admission of the list. Similarly, the telephone company employee testified to calls from the Carlos Moreno number to Whatley's home, although the relevant records were never put into evidence. This is not a matter for our decision now, for at most this evidence only shows that Whatley knew the conspirators, not that he participated in their conspiracy. There was substantial evidence that Whatley was acquainted with the conspirators. In fact, Whatley himself introduced such evidence.

Mere association with conspirators is not enough to establish participation in a conspiracy. *See, e. g., United States v. Longoria*, 569 F.2d 422, 425 (5th Cir. 1978). The government's evidence merely reveals that Whatley knew several of the conspirators. There is no showing, even arguably, that he knew of the conspiracy, let alone participated in it. Any association with the conspiracy would be forbidden speculation. The "appellant may be guilty, but his conviction cannot rest upon mere conjecture and suspicion." *Vick v. United States*, 216 F.2d 228, 233 (5th Cir. 1954). Whatley cannot be convicted because he spent time at the ranch. Similarly, even if his remarks at the time of his arrest were untrue, those statements will not support a finding of guilt, and may well be explained by the unexpected presence of armed men. *Cf. United States v. Duckett*, 550 F.2d 1027, 1030 (5th Cir. 1977) (alias); *Cooper v. United States*, 218 F.2d 39, 41 (D.C.Cir.1954) (soliciting false corroboration of alibi); *Vick* (flight).

Finally, the appellants contend that they were given severe sentences because they exercised their constitutional right to trial by jury. The appellants received sentences harsher than the Morenos and others who pled guilty, even though the Morenos led the organization. *See United States v. Wiley*, 278 F.2d 500, 504 (7th Cir. 1960). They have not shown that their refusal to plead guilty was a consideration in the assessment of the punishment. They were not sentenced by the same judge as those who pled guilty, and at oral argument counsel admitted there is no evidence that a choice of sentencing judge was part of the plea bargain. *See Finch v. United States*, 493 F.2d 455 (5th Cir. 1974) (review of sentence within statutory limits).

The convictions of Fitzharris and Cantu are AFFIRMED, and the conviction of Whatley is REVERSED.