# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 23, 2024

Lyle W. Cayce
Clerk

―――――――――

No. 22-40570

―――――――――

United States of America,

*Plaintiff—Appellee*,

*versus*

Maria E. Garcia,

*Defendant—Appellant*,

CONSOLIDATED WITH

―――――――――

No. 23-40145

―――――――――

United States of America,

*Plaintiff—Appellee*,

*versus*

Liang Guo Yu,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 7:18-CR-960-27,
7:18-CR-960-23

---

Before RICHMAN, *Chief Judge*, and OLDHAM and RAMIREZ, *Circuit Judges*.

IRMA CARRILLO RAMIREZ, *Circuit Judge*:

Defendants-appellants Maria E. Garcia and Liang Guo Yu appeal their convictions for money-laundering. Both contend that the evidence was insufficient to prove beyond a reasonable doubt that they committed the offenses with which they were charged. Garcia also asserts that the district court erred in assessing an enhancement at sentencing, and Yu maintains that the district court abused its discretion in denying his motions for a new trial and to suppress. We AFFIRM.

I

These consolidated appeals arise out of the Drug Enforcement Administration's (DEA's) investigation of the Villalobos drug trafficking organization (DTO) in Houston, Texas. The primary targets were the heads of the DTO, brothers Juan and Santiago Villalobos. The DTO moved hundreds of kilograms of cocaine and had yearly profits in the millions. As relevant here, the investigation led to the seizure of large sums of cash during two searches: one involving Yu, and one involving Garcia.

A

In 2016, DEA agents began surveilling Tomas Villarreal, the head of one of the DTO's money cells. Villarreal led agents to a potential stash house located on O'Mally street in Houston. While conducting surveillance of the O'Mally house on May 18, agents observed Ruby Guzman leave the house.

2

They followed her to a nearby Burger King, where she met with Michael Anthony Tovar and picked up a package from him before returning to the O'Mally house.

The following day, agents saw Guzman leave the house with a suitcase, place it in the trunk of her car, and drive to a Hilton hotel in downtown Houston. There, she spoke with Jonathan Xie,[1] and he retrieved the suitcase from the trunk of Guzman's car and carried it into the hotel. DEA Task Force Officer Alfonso Ceballos (TFO Ceballos) and DEA Agent Amin Rosado followed Xie into the hotel; TFO Ceballos rode in the elevator with Xie to the eleventh floor, and then Agent Rosado followed. They watched Xie enter a guest room. Roughly thirty minutes later, Xie and defendant Yu left the room. Yu was carrying the suitcase that Xie had retrieved from Guzman, and Xie was rolling a second suitcase.

Xie and Yu reached the hotel lobby, where Agent Rosado approached them, identified himself as law enforcement, and asked what was in Yu's suitcase. Yu responded, "my deposits." Agent Rosado detained Xie and Yu and called a canine officer; approximately ten to twenty minutes later, the canine officer arrived, and the canine alerted to both suitcases. Agent Rosado opened them and discovered that the suitcase that Yu was carrying contained "five bundles individually wrapped with vacuum sealed bags and then two separate money bundles with rubber bands strapped in—inside the suitcase" totaling $269,000. The search was conducted without a warrant.

Based on the agents' suspicion that the suitcase Yu was carrying was the one that Guzman had transported to the hotel from the O'Mally house, they obtained a warrant and searched the house. They found several bags of

---

[1] Xie was also charged as a co-conspirator and ultimately convicted. He appealed his convictions, but voluntarily dismissed the appeal in August 2023.

money, money counters, rubber bands, vacuum sealing bags, and vacuum sealing machines. In total, agents found $432,116 hidden in the house.

B

The DEA task force continued to investigate the DTO in the months following the May seizure. TFO Ronathan Persaud testified at trial that the task force was informed that a man named Christian Benavides was traveling to Houston to pick up some of the DTO's money. Agents located Benavides driving a white Range Rover and followed him to a Mi Tienda grocery store in Pasadena, Texas. Garcia then arrived at the grocery store, and Benavides followed her to a house on Tonkawa Circle in Pasadena. Garcia parked her car on the street in front of the house while Benavides pulled his car into the garage and closed the garage door.

Approximately twenty minutes later, Benavides left the Tonkawa house in his Range Rover and drove to a hotel. TFO Persaud approached Benavides, identified himself as law enforcement, and asked for consent to search the vehicle, which Benavides provided. TFO Persaud and other agents discovered cocaine and, in a hidden compartment, $196,715 cash in food saver bags.

The agents returned to the Tonkawa house, where Agent Rosado obtained Garcia's consent to search the house. Garcia gave the agents a black duffle bag that she said Luis Reyes, a DTO member who was the husband of her cousin, had delivered to her earlier that day with money in it. Agent Rosado asked Garcia how she had gotten involved with the DTO. She explained she had met Benavides in Mexico and he "recruited her to the organization." She had received a call two days before the search with instructions to go to the Tonkawa house and wait for someone to pick up some money. Garcia informed Agent Rosado that this happened

approximately twice a month, and she was paid between $500 and $600 each time and permitted to stay at the Tonkawa house for free.

C

A federal grand jury returned a twenty-count indictment charging twenty-eight individuals for their participation in the DTO. Yu and Garcia were charged with conspiring to launder monetary instruments in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), and 1956(a)(1)(B)(I)[2] and aiding and abetting money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2.

Before trial, Yu moved to suppress the evidence agents obtained during the May search. The district court denied Yu's motion before the Government responded and without a hearing.

At trial, the Government presented testimony from ten witnesses and introduced dozens of exhibits. Four agents, two canine unit officers, Guzman, Villarreal, Tovar, and Juan Villalobos testified regarding the DTO's activities and the details of the May and July searches. Based on his training and experience, TFO Persaud testified about the relationship between money laundering and drug smuggling activities. He specifically noted that the DTO was located in Mexico, so "money laundering is connected in it's the way that money is returned for the purchase of narcotics[.]" TFO Persaud and Agent Rosado also testified about information they obtained using Title III intercepts (wire taps), including a text message exchange between DTO members on May 19 referring to Xie and Yu transporting money on behalf of the DTO. The exchange also alluded to the "Chinos"—which the Government posits was a reference to Xie and

---

[2] Section 1956(a)(1)(B)(I) prohibits concealment money laundering. Yu and Garcia were indicted under this section, but ultimately the jury was not asked to consider it.

Yu—having been caught by law enforcement, and one DTO member asked if they were okay.

Juan Villalobos testified about the DTO's operations, his involvement, and how money deliveries were arranged. He explained that he worked for his brother, Santiago Villalobos, who was located in Mexico, and that Santiago coordinated the movement of money from Houston to Mexico. In order to verify Xie's and Yu's identities, Santiago would send the picture of a one- or five-dollar bill to Juan, and Xie and Yu would have to present the matching bill before they received the money to transport. Juan testified that he delivered over a million dollars to Xie and Yu in April or May of 2016, and Villarreal testified that he delivered more than a million dollars to Xie and Yu over three transactions. The Government also presented hotel records showing that Xie had reserved rooms at the Hilton hotel four times between December 2015 and January 2016.

Yu presented no witnesses in his defense. Garcia testified on her own behalf, rebutting the testimony of Agent Rosado; she presented no other witnesses. The jury found Yu and Garcia guilty of both charges. Both moved for a new trial and Yu also moved for a judgment of acquittal on the ground that there was insufficient evidence to support the verdicts. The district court denied all three motions.

Garcia was sentenced to two concurrent 78-month terms of imprisonment and two concurrent 3-year terms of supervised release. Yu was sentenced to two concurrent 151-month terms of imprisonment and two concurrent 3-year terms of supervised release. After sentencing, Yu filed a second motion for a new trial, asserting due process and ineffective assistance of counsel claims. He averred that his first language was Cantonese, and his trial counsel did not do an adequate job of ensuring that Yu understood every

stage of his proceedings. Four days later—before the Government responded—the district court denied Yu's motion as untimely.

Garcia and Yu timely appealed.

## II

Garcia and Yu argue that the evidence presented to the jury was insufficient to prove their guilt beyond a reasonable doubt.

We review properly preserved sufficiency-of-the-evidence arguments *de novo*. *See United States v. Williams*, 507 F.3d 905, 908 (5th Cir. 2007) (citing *United States v. Harris*, 420 F.3d 467, 470 (5th Cir. 2005)). "Under this standard, we determine whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *Id.* (citing *United States v. Lewis*, 476 F.3d 369, 377 (5th Cir. 2007)). "Even when examined de novo, 'review of the sufficiency of the evidence is highly deferential to the verdict.'" *United States v. Davis*, 735 F.3d 194, 198 (5th Cir. 2013) (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)). Accordingly, we evaluate all evidence and draw all inferences in favor of the prosecution. *United States v. Freeman*, 56 F.4th 1024, 1026 (5th Cir. 2023) (citing *United States v. Terrell*, 700 F.3d 755, 760 (5th Cir. 2012)). But "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996); *see also United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980) ("[A] conviction cannot rest on an unwarranted inference, the determination of which is a matter of law.").

Yu and Garcia properly preserved their challenges to the sufficiency of the evidence below. They were both convicted of conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(2)(A) and aiding and abetting money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2. Their convictions were based on the same substantive

money laundering offense—often termed "promotion money laundering," *see, e.g.*, *United States v. Trejo*, 610 F.3d 308, 310 (5th Cir. 2010) (quotation omitted)—which prohibits the transportation of money to or from another country "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). Here, the indicted "specified unlawful activity" was "the distribution of a controlled substance."

To convict a defendant of promotion money laundering, the Government must prove the defendant (1) transported or attempted to transport money between the United States and another country (2) "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A); *see also Trejo*, 610 F.3d at 313–14. To establish conspiracy to commit money laundering, the Government must prove the defendant "(1) conspired (2) to transport funds between the United States and another country; (3) with the intent to promote the carrying on of a specified unlawful activity." *Trejo*, 610 F.3d at 313–14.

A

Garcia argues the Government failed to present sufficient evidence as to every element of both convictions.

1

Garcia first contends that the Government did not present sufficient evidence that she engaged in a conspiracy to launder monetary instruments. She maintains that the indicted conspiracy pertained only to the events surrounding the May search, and that she therefore was not involved in the conspiracy as alleged in the indictment.

Count Two of the indictment is not limited—expressly or impliedly—to the May search. It lists a number of co-conspirators—including, but not limited to, Garcia, Yu, Xie, Tovar, and Guzman—and sets out the conduct

they engaged in that violated § 1956, without any reference to exact dates or locations. Moreover, nothing in the jury instructions pertaining to this count narrowed its reach to only the May search. Garcia's first argument is unavailing.

2

Garcia next maintains there is no evidence to support the jury's conclusion she entered into an agreement to transport money between the United States and another country.

"We have specifically stated in the context of a sufficiency challenge to a money-laundering conspiracy that direct evidence 'is unnecessary; each element may be inferred from circumstantial evidence." *United States v. Cessa*, 785 F.3d 165, 174 (5th Cir. 2015) (quoting *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006)). In particular, "the agreement element 'may be inferred from a concert of action.'" *Id*. (quoting *Fuchs*, 467 F.3d at 906).

Agent Rosado testified at trial that Garcia informed him that she was recruited into the DTO by Benavides in Mexico. Approximately twice a month, she said, she would receive a phone call from someone named El Viejo with instructions to go to the Tonkawa house and wait for money to be delivered. She did so in July 2016, and she received a bag full of money from her cousin's husband, Luis Reyes. Additionally, Agent Rosado and TFO Persaud testified they witnessed Garcia meet with Benavides and lead him back to the Tonkawa house. There, Benavides pulled into the garage and closed the garage door; when he left twenty minutes later, agents followed him to a hotel, searched his vehicle, and discovered $196,715 in a hidden panel in his car. This testimony is sufficient circumstantial evidence of an agreement between Garcia, El Viejo, and Benavides to transport the money that was found in Benavides's car. A reasonable jury could infer from this evidence that the purpose of that agreement was to transport money from the

United States to another country—Mexico—based on the fact that Garcia was recruited by Benavides in Mexico.

The Government presented sufficient evidence that Garcia entered into an agreement to transport money between the United States and Mexico.

3

Garcia contends that the Government did not present sufficient evidence of her intent to promote the distribution of a controlled substance.

Section 1956(a)(2)(A)'s intent requirement is "stringent." *Trejo*, 610 F.3d at 315. In *Trejo*, we held a guilty plea that "unmistakabl[y] demonstrated that [the defendant] entered into a paid arrangement with a drug dealer . . . to load [the defendant's] car with drug money and transport it from Florida to a presumed trafficker in Mexico" was insufficient to support a finding the defendant intended to promote the drug trafficking activity. *Id.* at 318. We explained:

> "knowing promotion" is not enough for a conviction under the federal money laundering statute. . . . Instead the facts must demonstrate that, in transporting the funds, [the defendant] not only promoted the underlying drug trafficking business but that his intended purpose in so doing—an end-goal, if you will—was to further the progress of the drug business. . . . In other words, there must be "more" than simply the bare act of knowingly transporting the drug money. Otherwise, every mere transportation of drug money in this manner would also qualify as a money laundering offense.

*Id.* at 317 (internal citations omitted) (quoting *United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999)).

We also indicated, however, that evidence the defendant "knew something about the inner workings of the drug organization"

or of "the defendant's direct involvement in the illegal enterprise" may support a finding of the requisite intent. *Id*. at 316. In many of our cases addressing § 1956(a)(2)(A)'s intent element and those of analogous statutes, the defendants have been exposed to or told about drugs. *See, e.g.*, *United States v. Alaniz*, 726 F.3d 586, 602–03 (5th Cir. 2013); *United States v. Calderon*, 665 F. App'x 356, 363 (5th Cir. 2016) (per curiam) (unpublished). But several of our sister circuits have held a defendant's extensive participation in an organization is sufficient circumstantial evidence that he knew of the organization's illicit activities. *See, e.g.*, *United States v. Prince*, 618 F.3d 551, 560 (6th Cir. 2010); *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).

Juan Villalobos's testimony established that the DTO was engaged in drug trafficking. Garcia was recruited to join the DTO by Benavides in Mexico and subsequently made several trips to the Tonkawa house. She knew that large sums of money were delivered to the house, and she interacted with at least three different people as part of the events leading up to the July search. Circumstantial evidence suggests Garcia knew that the money was then concealed inside Benavides's vehicle. Although the Government did not present direct evidence tying Garcia, Benavides, El Viejo, or Reyes to the DTO specifically, it did provide circumstantial evidence linking the July search to the DTO's activities. For example, agents testified to the DTO's practice of transporting money in vacuum-sealed bags placed in hidden compartments inside cars. This evidence, though limited, is sufficient to prove that Garcia intended to promote the DTO's unlawful ends.

Garcia's sufficiency challenge to the specific intent element of her conviction under § 1956(a)(2)(A) fails.

11

22-40570
c/w No. 23-40145

4

Finally, Garcia argues that the evidence of her aiding and abetting money laundering was insufficient.

"To prove that a defendant aided and abetted money laundering, the government must show that the defendant 'associated himself with the unlawful financial manipulations, that he participated in them as something he wished to bring about, and that he sought, by his actions, to make the effort succeed.'" *United States v. Willey*, 57 F.3d 1374, 1383 (5th Cir. 1995) (quoting *United States v. Termini*, 992 F.2d 879, 881 (8th Cir. 1993)). "A defendant associates himself with the unlawful financial manipulations if he shares in the criminal intent of the principal. . . . And he participates in those manipulations if he engages in some affirmative conduct designed to aid the conduct." *United States v. Delgado*, 256 F.3d 264, 276 (5th Cir. 2001) (internal citation omitted) (citing *United States v. Sorrells*, 145 F.3d 744, 753 (5th Cir. 1998)).

The evidence discussed above in the context of Garcia's challenge to the specific intent element of her conspiracy conviction is also probative of her association with the unlawful financial manipulations involved here. Because we conclude that the Government proved, beyond a reasonable doubt, that Garcia intended to promote the distribution of a controlled substance, it presented sufficient evidence to prove the first element of the aiding and abetting charge.

A defendant participates in the unlawful conduct if she affirmatively acts to aid it. *Delgado*, 256 F.3d at 276. Agent Rosado's testimony regarding Garcia's involvement with the DTO and Agent Rosado's and TFO Persaud's testimony about her interaction with Benavides support this element of the aiding and abetting charge. From this evidence, a reasonable jury could find that Garcia affirmatively acted to aid the unlawful financial

manipulations. This evidence is also sufficient to prove beyond a reasonable doubt that Garcia "sought, by [her] actions, to make the effort succeed." *Willey*, 57 F.3d at 1383.

Therefore, the evidence was sufficient to convict Garcia of aiding and abetting money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2.

B

Yu argues that there was insufficient evidence as to the specific intent element of both offenses.

As discussed, *Trejo* established that the requisite intent to support a conviction under § 1956(a)(2)(A) is difficult to prove. 610 F.3d at 315. But again, extensive involvement in the organization can suggest an intent to promote its unlawful goals. *See Huezo*, 546 F.3d at 182 ("Based on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds[.]"). And in the closely related transaction money laundering context, we have noted that "the Government must present either direct proof of an intent to promote such illegal activity or proof that a given type of transaction, on its face, indicates an intent to promote such illegal activity." *United States v. Miles*, 360 F.3d 472, 477 (5th Cir. 2004).

Yu's statement that the suitcase contained his "deposits" indicates that he was aware of the contents of the suitcase. Testimony from Villarreal and Juan Villalobos revealed Yu regularly interacted with several members of the DTO, and he transported large sums of money for the organization on at least three separate occasions. Given the scale of the DTO's operations, that it trusted Yu with millions of dollars multiple times, and Yu's interactions with several different members of the DTO, a reasonable jury could infer that

Yu was aware of the DTO's drug trafficking activity and intended to promote it. The evidence was sufficient to establish, at the least, that Yu engaged in "a given type of transaction [that], on its face, indicates an intent to promote" drug trafficking. *Miles*, 360 F.3d at 477.

Yu relies on three circuit court decisions in arguing that the evidence was insufficient to establish intent, but all three are distinguishable. In *Trejo*, the defendant "signed on for a *one-time* trip to transport drug money for a dealer he did not know and, except for the one trip, had never worked for in the past." 610 F.3d at 318 (emphasis added). Additionally, "[e]vidence regarding the inner workings of the organization that hired him—assuming that an operation existed beyond [one drug dealer]—[was] virtually nonexistent in the record." *Id*. Finally, "the record lack[ed] facts regarding the individuals to whom [the defendant] was delivering the money and the nature of their ongoing activities, if any, beyond the one delivery." *Id*. Here, the Government presented evidence as to each of these facts. Witnesses testified that Yu engaged in multiple transactions with the DTO, that the DTO was extensively involved in the drug trafficking business, and that Yu interacted with several individuals within the organization. These facts differentiate Yu's circumstances from those of the defendant in *Trejo*.

Yu's actions are also meaningfully different from the defendant's actions in *Cessa*. There, we vacated the conviction of a horse trainer for a concealment money-laundering conspiracy because there was insufficient evidence to show he knew his horse training services were designed to conceal drug money. 785 F.3d at 179. Unlike horse training—which, without more, does not raise suspicions that it is furthering the goals of a drug trafficking organization—Yu's actions involved transporting large sums of vacuum-sealed money with no apparent legitimate source. *Cessa* is therefore inapposite.

Finally, in *United States v. Adams*, the Seventh Circuit vacated a conviction for a promotional money-laundering conspiracy based on insufficient evidence the defendant's co-conspirator had the intent to promote the carrying on of an unlawful activity. 625 F.3d 371, 382 (7th Cir. 2010). The defendant instructed his purported co-conspirator to purchase postal money orders in structured amounts and at different locations. *Id*. at 381. Unlike Yu, the co-conspirator in *Adams* was operating under instructions from one individual who used the money at issue for a "variety of purposes, some related to his drug trafficking . . . and some not . . . for example, the purchase of a restored Fleetwood Cadillac automobile and the rent on his apartment." *Id*. at 375. The evidence here indicates Yu knew he was moving money for an organization, presumably with a unifying purpose, rather than just one individual with mixed motives.

For these reasons, Yu's sufficiency challenge fails as to both his conspiracy to commit money laundering conviction and his aiding and abetting money laundering conviction.

## III

Garcia maintains that the district court erred in assessing a six-level sentencing enhancement.

We review a trial court's application and interpretation of the sentencing guidelines *de novo* and its findings of fact for clear error. *United States v. Chavez-Hernandez*, 671 F.3d 494, 497 (5th Cir. 2012) (citing *United States v. Gharbi*, 510 F.3d 550, 554 (5th Cir. 2007)). "A sentence within the properly calculated Guidelines range is presumed reasonable on appeal." *United States v. Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009).

Under U.S.S.G. § 2S1.1(b)(1), if the defendant "knew or believed that any of the laundered funds were the proceeds of, or were intended to promote [] an offense involving the manufacture, importation, or distribution of a

controlled substance[,]" the base offense level for that defendant should be increased by 6 levels. For this enhancement to apply, the district court must "find, by a preponderance of the evidence, that [the defendant] knew the laundered funds were the proceeds of drug sales[.]" *United States v. Pendleton*, 761 F. App'x 339, 355 (5th Cir. 2019) (per curiam) (citing U.S.S.G. § 2S1.1(b)(1)).

Here, Garcia argues that there is no evidence that she knew any of the laundered funds were proceeds of or were intended to promote a drug trafficking offense. This issue overlaps considerably with our analysis above regarding the sufficiency of the evidence supporting Garcia's underlying conviction. Because we conclude that there was sufficient evidence to convict Garcia of money laundering, including evidence that she intended to promote the unlawful distribution of a controlled substance, we also hold that the district court properly imposed a sentencing enhancement under U.S.S.G. § 2S1.1(b)(1). *See Fernandez*, 559 F.3d at 320 ("The jury had to find that [the defendant] was aware the proceeds stemmed from controlled-substance violations in order to convict him of the money laundering counts. It was not error for the district court to make the same finding."). Additionally, the district court expressly imposed a sentence on the lower end of Garcia's Guidelines range; the sentence is therefore presumed reasonable on appeal, and we find no basis in the record to disturb it.

## IV

Yu contends that the district court improperly denied his motion to suppress without first conducting an evidentiary hearing.

## A

We review a district court's declination to conduct a suppression hearing for abuse of discretion, subject to a harmless error analysis. *United States v. Smith*, 977 F.3d 431, 434 (5th Cir. 2020) (citing *United States v.*

*Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983)). "A district court abuses its discretion 'if it bases its decision on an error of law or a clearly erroneous assessment of the evidence.'" *Id.* (quoting *United States v. Mann*, 161 F.3d 840, 860 (5th Cir. 1998)). A hearing on a motion to suppress is "not granted as a matter of course" and is required "only when necessary to receive evidence of an issue of fact." *Harrelson*, 705 F.3d at 737. To be entitled to a hearing, the movant must "allege[] sufficient facts which, if proven, would justify relief." *Id.* (citing *United States v. Smith*, 546 F.2d 1275, 1279–80 (5th Cir. 1977)).

Here, Yu presented only a vague three-sentence affidavit in support of his motion to suppress. It stated, in its entirety:

> On May 19, 2016, the Defendant was detained at the lobby of a hotel in Harris County, Texas.
>
> Agents detained the Defendant and proceeded to search a large black suitcase in his possession. The agents discovered a large amount of cash in the suitcase.
>
> The Defendant claims he did no [sic] consent to his detention nor to the search of the suitcase.

This evidence does not suggest that relief was warranted. For example, it does not establish what was happening directly before the search, and it does not even establish that a warrantless search took place. Accordingly, the district court did not abuse its discretion when it declined to conduct an evidentiary hearing before ruling on the motion to suppress. *See United States v. Regan*, 832 F. App'x 898, 899 (5th Cir. 2021) (per curiam) (affirming district court's decision not to conduct a hearing where movant provided only "bare assertions, with no supporting details or facts").

B

Yu further maintains that the court improperly denied his motion to suppress because it reversed the applicable burden of proof.

"When reviewing the denial of a motion to suppress, we review questions of law *de novo* and findings of fact for clear error." *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020) (citing *United States v. Bolden*, 508 F.3d 204, 205 (5th Cir. 2007)). The evidence is, again, viewed in the light most favorable to the Government, as the prevailing party below. *United States v. Jefferson*, 89 F.4th 494, 502 (5th Cir. 2023). In reviewing the district court's decision, we may "consider all of the evidence presented at trial, not just that presented before the ruling on the suppression motion[.]" *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). The decision is also subject to a harmless error analysis. *See United States v. Willingham*, 310 F.3d 367, 372 (5th Cir. 2002). "In the context of suppression of evidence, the test for harmless error is whether the trier of fact would have found the defendant guilty beyond a reasonable doubt if the evidence had been suppressed." *United States v. Aucoin*, 964 F.2d 1492, 1499 (5th Cir. 1992) (internal quotations omitted and alterations adopted).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992). To do so, the movant must show two things:

> First, he must show that a government activity intruded upon a reasonable expectation of privacy in such a significant way that the activity can be called a "search." Second, if a search has in fact occurred, [the movant] must show that the government intrusion was unreasonable given the particular facts of the case.

*Id.* (citing *United States v. York*, 895 F.2d 1026, 1028 (5th Cir. 1990)). This may require the movant to present evidence of the circumstances surrounding the search, for instance to establish that he had a reasonable expectation of privacy in the object of the search. *See id.* at 180–81 (noting that the movant has the burden of showing that the search violated his Fourth Amendment rights and that he failed to allege sufficient particularized facts to prove that he had a reasonable expectation of privacy in his phone conversation).

Yu correctly argues that we have previously employed a burden-shifting framework when analyzing motions to suppress. But he overlooks the critical first step in that framework: Yu, as the proponent of the motion to suppress, must first "produce[] evidence that he was arrested or subject to search without a warrant" and only then will "the burden shift[] to the government to justify the warrantless search." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).

Here, Yu's affidavit did not even establish that the search occurred without a warrant. Although the motion to suppress alleged a warrantless search, "counsel's statements in [a] motion and subsequent briefs are not evidence." *See INS v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984). It was first Yu's burden to "produce[] *evidence*" that the search violated his Fourth Amendment rights. *Roch*, 5 F.3d at 897 (emphasis added). His skeletal affidavit did not suffice, so the district court correctly denied his motion to suppress.

Even if the district court improperly denied the motion, any error in doing so was harmless. When reviewing a decision on a motion to suppress, we are free to consider all evidence presented at trial to determine "whether the trier of fact would have found the defendant guilty beyond a reasonable

doubt if the evidence had been suppressed." *Aucoin*, 946 F.2d at 1499. As we have noted already, testimony from several witnesses at trial established Yu's connection to the DTO. He moved millions of dollars for the organization on at least three occasions, and agents testified to the events leading up to the May search, corroborating the contents of the suitcase and Yu's involvement in transporting it. The evidence was sufficient to convict Yu even if the motion to suppress had been granted.

V

Finally, Yu argues that the district court erred in denying his motion for a new trial as untimely. He specifically objects to the district court's *sua sponte* dismissal of his motion based on timeliness before the Government responded.

We review a district court's denial of a motion for new trial for abuse of discretion. *United States v. Barraza*, 655 F.3d 375, 379 (5th Cir. 2011) (citing *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001)). Federal Rule of Criminal Procedure 33 requires a defendant to file a motion for new trial that is based upon grounds other than newly discovered evidence within fourteen days after a verdict is rendered. Fed. R. Crim. P. 33(b)(2). The Supreme Court has characterized Rule 33 as a non-jurisdictional claim-processing rule; as a result, the defense of untimeliness can be forfeited if the Government fails to raise it in response to a motion for new trial. *Eberhart v. United States*, 546 U.S. 12, 19 (2005). In an unpublished opinion, we have held that "[a] district court does not err, after *Eberhart*, if it enforces an inflexible claim processing rule, and we may not reverse its decision to do so." *United States v. Bouldin*, 466 F. App'x 327, 328 (5th Cir. 2012) (unpublished) (per curiam) (internal quotation marks omitted) (quoting *United States v. Leijano-Cruz*, 473 F.3d 571, 574 (5th Cir. 2006)); *see also Leijano-Cruz*, 473 F.3d at 574 (noting that *Eberhart* established only the

principle that "a district court's decision to permit an untimely document to be considered could not be reversed in the absence of an objection by the government in the district court[,]" and not the principle "that a defendant . . . has a right to have [his] untimeliness disregarded").

Here, Yu was convicted on April 14, 2022. He filed his second motion for a new trial on February 27, 2023. In it, he asserted only due process and ineffective assistance of counsel claims. Because his motion for new trial was not based on newly discovered evidence, it had to be filed within fourteen days of the date of the verdict. Because it was not, the district court did not abuse its discretion in denying the motion as untimely, even absent a response from the Government.

## VI

For the foregoing reasons, the judgments of the district court are AFFIRMED.